**EXHIBIT C**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

SCOTTSDALE CAPITAL ADVISORS CORP. and
JOHN HURRY

                      Plaintiffs,                    Index No. 154500/2016

    - against –

THE DEAL, LLC, WILLIAM MEAGHER and        **VERIFIED COMPLAINT**
JOHN DOES 1-30

                      Defendants.
-------------------------------------------------------------------X

The plaintiffs, by their attorneys, CKR Law, LLP, complaining of the defendants herein (each, a "Defendant"), respectfully allege:

1. At all the times hereinafter mentioned, plaintiff Scottsdale Capital Advisors Corp. is a corporation organized and existing under the laws of the state of Arizona ("Scottsdale"), and maintains its principal place of business in Scottsdale, Arizona.

2. Plaintiff John Hurry ("John Hurry" and, together with Scottsdale, the "Plaintiffs" and each a "Plaintiff") is an individual residing in Glenbrook, Nevada.

3. Plaintiff John Hurry was, through the end of 2012, an executive officer of Scottsdale.

4. At all the times hereinafter mentioned, Scottsdale was and still is, a securities broker dealer engaged the business of holding and trading in securities.

5. Scottsdale is and always was, a duly registered member firm of the Financial Industry Regulatory Authority ("FINRA"). Scottsdale is and, at all relevant times was, registered as a broker dealer through FINRA in New York authorized to transact business with customers in the state of New York.

6. Upon information and belief, at all the times hereinafter mentioned, the defendant The Deal LLC ("The Deal") was and still is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware, with its principal place of

business in the City, County, and State of New York.

7. Neither John Hurry nor Scottsdale are public persons, public officials, celebrities or otherwise governmental agencies or affiliates.

8. Scottsdale and Hurry operate in a highly regulated business and, false or defamatory statements would have a severe detrimental effect on the reputations of Plaintiffs and even on their ability to conduct and grow their business or personal lives.

9. The address posted for notices to Defendant The Deal, which can be found on the "Terms and Conditions" page of The Deal's website, is 14 Wall Street, New York, New York 10005. The parent company and control person of The Deal, The Street.com, Inc. is located at the same address.

10. Upon information and belief, The Deal is, and at all relevant times was, in the business of publishing print and electronic media in the financial services sector.

11. Among other publications, magazines, blogs, webinars and related media utilized by Defendant The Deal, The Deal at all relevant times published online or print magazines known as "The DealFlow Report" ("DealFlow") and "The Deal Pipeline" ("Pipeline") which tend to focus on the small cap and micro-cap segments of the securities and financial services industry. The Deal would then release and distribute these articles through various mediums and affiliates, including, without limitation, TheStreet.com.

12. Upon information and belief, Defendant The Deal compensates its writers and receives financial benefit from articles that are published from both subscriptions and advertising revenues as well as, possibly, other sources of revenues.

13. Upon information and belief, at all the times hereinafter mentioned, DealfFlow and Pipeline was published or disseminated daily or weekly except Sunday, and are disseminated primarily through emails and Defendant's websites.

14. Dealflow and Pipeline enjoyed a large sale and circulation to the public in the City and State of New York and elsewhere in the United States.

15. In particular, Dealflow and Pipeline enjoy large sale and circulation to entities and persons in the financial services industry throughout the world and, more particularly, the

micro-cap and small cap market sector of the industry upon which Scottsdale and Hurry conduct business.

16. Upon information and belief, at all the times hereinafter mentioned, all or some of the individual Defendants were and still are residents of the State of New York or conduct business in New York or were present in New York at relevant times.

17. Upon information and belief, at all the times hereinafter mentioned, the Defendant Bill Meagher ("Meagher") was a writer who wrote articles that were published in Dealflow or Pipeline or other mediums operated by or for The Deal or published or distributed by The Deal and, Defendant Meagher received compensation for such services. Upon information and belief from other law suits against him, Defendant Meagher maintains a residence in the State of California but regularly writes for and is published through, The Deal and The Street.com which are both located in New York, New York, with dissemination throughout the world.

18. Upon information and belief, Defendants John Doe 1-10 were persons who had supervisory control or edited or disseminated the defamatory articles published by The Deal with knowledge or notice of their falsehood.

19. Upon information and belief, Defendants John Doe 11-20 were persons who provided false information to The Deal, Meagher or other Defendants.

20. Based on statements made by Defendants in their articles quoting a "source" within the FINRA or government agencies who provided information, John Does 21-30 are persons employed by or who received confidential information from, FINRA or any government agency with respect to Plaintiffs who are private persons and, made false statements to The Deal, Meagher or other Defendants in violation of their duty of care or terms of employment.

21. Defendants, as with all media outlets, enjoy and benefit from "sensationalism". One particular subject that the Defendants have enjoyed publishing, disseminating and re-posting, involves a regulatory action in 2013 by the Securities & Exchange Commission (the "SEC") as against certain foreign shareholders of a company known as Biozoom. Certain of these foreign shareholders held accounts at Scottsdale and cleared through its clearing firm.

22. On May 28, 2015, the Defendant The Deal published and circulated in Pipeline and possibly other online, electronic, email or print mediums, and, upon information and belief,

3

the individual defendants participated in the preparation and publication of a false, defamatory, malicious, and libelous article of and concerning the Plaintiffs (the "May 2015 Defamatory Article") which article contains *inter alia* the following matter, to wit, statements that:

> "Scottsdale provided those investors with services that were *not* available to other Scottsdale clients, *a source* told The Deal…" [*emphasis added*]; and

> "Typical clients paid 4% per transaction or 4.5% if their transactions were cleared through Alpine. Longtime clients who did a heavy volume of business might occasionally have received discount of one percentage point. But Biozoom clients paid just 2%."; and

> "A standing Scottsdale policy only allowed clients to wire funds from their accounts to banks in the U.S. or to institutions in the country where they lived. But the person said that Biozoom shareholders were allowed to send funds to Cyprus, Switzerland, Panama, and Belize despite the fact that all of them lived in Argentina and had signed documents agreeing to abide by Scottsdale wire policy."

23. The above statements are patently false, misleading and/or paint, or are maliciously intended to paint, Plaintiffs in a bad light for cooperating with a regulatory investigation against third parties

24. The above statements purport to "identify a source" which implied that said source is within FINRA or government regulatory agencies that have discussed confidential information involving Plaintiffs, however, the source, if any in actuality existed, did not have "inside" information or the correct facts and, the identity of such sources would not be protected by the NYS "Shield" laws. Moreover, Defendants could have easily verified that said facts were patently not accurate.

25. Defendants also acted in bad faith in failing to verify their facts because, presuming they did have a source within a regulatory agency that purported to have knowledge, they knew or should have easily known that enforcement arms do not jeopardize their cases by publicizing information and, Defendants knew or should have known that said information was being provided in bad faith, prematurely prior to any investigation and that no regulator bound by secrecy laws would provide said information but for an intent to "sway" the public eye and

aid in an enforcement action.

26. Upon information and belief, the source may have been from an overzealous agent within FINRA, a regulatory agency, that merely conspired and "used" Defendants to aid in creating sensationalism and to aid in an enforcement action which, in the end, never materialized.

27. Nonetheless, Defendants, who are knowledgeable of the securities industry, could easily have ascertained that the items published were either false, or were exaggerated so as to paint Plaintiffs in a bad light.

28. When printing the May 2015 Defamatory Article, the Defendants did so with malice and, at that point, information was *already available* indicating that no enforcement action had been taken as against Scottsdale. The Defendants have previously made patently false statements relating to Defendants, and in particular, accused it of being the subject of an FBI investigation. Said statements were false and, in fact, Defendants have no "source" within the FBI that would provide them with confidential information relating to an investigation.

29. Specifically, in Pipeline articles dated as of March 20, 2014 (see Exhibit "A") and April 16, 2014 (See, Exhibit "B") (collectively, the "Earlier Articles"), Defendants repeatedly made false statements that "Scottsdale" was under FBI investigation. Said statements were and are false.

30. Defendants were notified by Plaintiffs prior to publication of the May 2015 Defamatory Article that the statements in the Earlier Articles about an FBI investigation of Scottsdale or its principals was false and could cause irreparable harm and injury in a regulated environment. In fact, it turns out, that the FBI had never made such statements and would not, as a matter general policy, make such a statement.

31. Moreover, it turns out, that no enforcement actions were taken against Scottsdale for the purported "evils" that Defendants reiterated in their May 2015 Defamatory Article, any of which, if true, would have resulted in FINRA or SEC sanctions and Defendants, being proficient in the US Regulatory environment are aware of the same.

32. Indeed when trying to verify its information, Defendants noted that that the FBI did not confirm any kind of "Investigation" relating to Scottsdale or its principals. Nonetheless,

5

Defendants did not post a retraction or remove the false information and continued and currently continue to disseminate and publish said statements in articles.

33. Moreover, by the time of the May 2015 <u>Defamatory</u> Article, Defendants had the complete benefit of time and hindsight and saw that none of their earlier statements were verified by enforcement activity afterwards. For example, there was no FBI investigation. Neither the SEC nor FINRA sanctioned Mr. Hurry or Scottsdale for the alleged bad acts mentioned in said articles and, had there been any truth to them the first time around in 2013, these agencies, during their annual and other reviews, would have surely fined or sanctioned Defendants resulting in public disclosure.

34. Instead, Defendants simply rehashed two-year old unverified information that they knew was questionable, without giving it any thought or logic. Meanwhile, it was patently obvious to the world that these older "sources" had misinformed them.

35. Defendants also made other statements in the Earlier Articles intended to paint Plaintiffs in a negative light, including that Scottsdale and its clearing firm Alpine Securities, Inc. were prohibited from "destroying" certain records in connection with an investigation over clients that held accounts at Scottsdale (among other broker dealers). Meanwhile, said statements are misleading in that all broker dealers and regulated FINRA member firms are required to always keep documents and files for requisite time periods as a matter of due course *anyhow*.

36. Despite learning of the truth, Defendants continued to disseminate and publish on their electronic media said earlier articles.

37. Upon information and belief, at the time of the aforesaid publications, the Defendants were acting with actual malice in that the defendants knew that the articles and matters contained therein concerning the plaintiffs so published, were false and untrue, or were published with reckless and wanton disregard of whether they were false and untrue.

38. In addition, to the extent that Defendants purported to "site sources" within FINRA that provided them with information, Defendants The Deal and Meagher knew or should have known, that FINRA employees may not discuss private matters relating to its private members.

6

39. Upon information and belief, FINRA itself denied that the FBI was investigating Scottsdale or Hurry themselves. Moreover, FINRA documents, which are readily ascertainable and obtainable, would readily show that they received no information relating to an FBI investigation with respect to Plaintiffs themselves.

40. As a result of the publications and the acts of the Defendants in connection therewith, the Plaintiffs have been held up to public contempt, ridicule, disgrace, and prejudice; have had difficulty conducting business, opening and operating accounts, have suffered great mental pain and anguish; and have been irreparably injured in their good names, business reputation, and social standing and, have lost the esteem and respect of their friends, acquaintances, business associates, and of the public generally.

41. That by reason of the foregoing, the plaintiff has suffered damages in an amount to be determined upon the trial of this action.

42. The amount of damages sought in this action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally in an amount to be determined upon the trial of this action, together with the costs and disbursements of this action.

WHEREFORE, Plaintiffs demand declaratory judgment against Defendants to remove, or edit all defamatory statements to the extent the same continue to be published or disseminated on their websites, via email or other publications that they operate.

Dated: New York, New York
       September 7, 2016

**CKR LAW LLP**

By: /s/Ron Levy
*Attorneys for Plaintiffs Scottsdale Capital Advisors Corp. and John Hurry*
1330 Avenue of the Americas
14th Floor
New York, NY 10019
(p) 212-400-7300
(f) 212-400-8200

## VERIFICATION

STATE OF ARIZONA )

COUNTY OF MARICOPA ) ss.:

HENRY W. DIEKMANN, being duly sworn, deposes and says:

I am a President and representative of the Plaintiff, SCOTTSDALE CAPITAL ADVISORS CORP, in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

_____
Henry W. Diekmann

Sworn to before me this
7th day of September 2016

NOTARY PUBLIC

DEBRA LYNN FRIEDNASH
Notary Public, State of Arizona
Maricopa County
My Commission Expires
November 14, 2019

## VERIFICATION

STATE OF ARIZONA )

COUNTY OF MARICOPA ) ss.:

John Hurry, Plaintiff in this action, being duly sworn, deposes and says:

1. I served as President, of SCOTTSDALE CAPITAL ADVISORS CORP., co-Plaintiff in this action, between 2002 and 2012.

2. I have read the foregoing complaint, and I know the contents thereof to be true to my knowledge, except as to matters stated to be alleged upon information and belief and, as to those matters, I believe them to be true.

_____
JOHN HURRY

Sworn to before me this
7th day of September, 2016

DEBRA LYNN FRIEDNASH
Notary Public, State of Arizona
Maricopa County
My Commission Expires
November 14, 2019

NOTARY PUBLIC

SEC requests default judgment in $34M Biozoom pump-and-dump case By Bill Meagher Updated 04:10 PM, Mar-20-2014 ET

The **Securities and Exchange Commission** plans to request a default judgment against the 10 Argentine residents who have been named as defendants in the $34 million Biozoom Inc. pump-and-dump case after two law firms representing the Argentines asked to withdraw from the case.

The SEC filed a letter Tuesday, March 18, with Judge Naomi Buchwald in the U.S. District Court in Manhattan, stating that it planned to request the judgment because the defendants had failed to respond to the lawsuit by court ordered deadlines.

Four days earlier, attorney Marc Agnifilo had informed the court that his firm, New York-based Brafman & Associates PC, would withdraw as counsel to the Argentines.

Brafman is the second firm that has represented the group charged with selling 20.3 million shares of Biozoom without proper registration. In September, **McLaughlin & Stern LLP** also withdrew.

Brafman is a high-profile criminal defense firm that has counted crime boss Salvatore "Sammy the Bull" Gravano, rapper Sean Combs and former International Monetary Fund chief Dominique **Strauss**-Kahn among its clients.

Agnifilo declined to comment on the firm's withdrawal from the Biozoom case. In his letter to the court, he said that Brafman had been told by the Argentines that it would be retained, but that a retainer agreement was never signed.

Those named as defendants are Magdalena Tavella, Andres Horacio Ficicchia, Gonzalo Garcia Blaya, Lucia Mariana Hernando, Cecilia De Lorenzo, Adriana Rosa Bagattin, Daniela Patricia Goldman, Mariano Pablo Ferrari, Mariano Graciarena and Fernando Loureyro.

None of them responded to e-mails requesting comment.

A person familiar with the case said that Buenos Aires-based lawyer Juan Ignacio Prada has been seeking representation for the group. Prada did not respond to a request for comment.

Patrick Bryan, assistant chief litigation counsel for the SEC, said the commission will file paperwork to pursue the default judgment in the next month. He declined to comment further.

The SEC filed the lawsuit last July, claiming that the Argentines had opened brokerage accounts at Arizona-based Scottsdale Capital Advisors and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the stock was purchased from shareholders in Entertainment Arts Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

In its complaint, the SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation.

The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

The promotion was unusual in the form it took. It included advertising in mainstream media outlets, including the New York Times and **USA Today**. In June, ads that took up most of a full page were placed in those newspapers that ostensibly promoted a London-based publication called Global Financial Insights. But, while the ads included subscription information and other

details about the publication, most of their space was taken up with the magazine's recommendation of Biozoom stock.

Both ads featured a headline that read, "Innovative Technology Company Invents Real 'Star Trek' Medical Scanner that Diagnoses Patient Health in Seconds."

A recommendation for Biozoom stock also featured prominently in an advertisement for a newsletter called TheStockReport.com that ran on the Rush Limbaugh radio show.

Previously, TheStockReport.com had produced a 24-page publication about Biozoom, which was distributed May 16, the day that Biozoom began trading at $1.10. The report valued the shares at $10.30.

The FBI and the Financial Industry Regulatory Authority have been investigating the involvement of Scottsdale and Alpine Securities, its Salt Lake City-based clearing firm, in connection with the Biozoom stock sales since May, according to a person with knowledge of the probe.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under an unusual request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

Finra has scheduled an audit of Scottsdale at the end March, according to a person familiar with the investigation.

Representatives of the SEC, Finra, Scottsdale and Alpine declined to comment. An FBI spokesman said the agency will neither confirm nor deny the existence of an investigation.

Read more: http://pipeline.thedeal.com/tdd/ViewArticle.dl?id=10007955861#ixzz2wbopcwyV



[RETURN TO ARTICLE]

Law

Share    Reprint    Save to My Articles

# Finra focusing on money-laundering violations

By Bill Meagher    Updated 07:00 PM, Apr-16-2014 ET

On March 10, the staff at Scottsdale Capital Advisors was startled when their receptionist called out into the office, "Finra is here!"

While representatives from the Financial Industry Regulatory Authority were expected at the end of the month for a scheduled two-week exam, this visit had nothing to do with that appointment. Rather, the investigators asked for files relating to overseas clients and omnibus accounts, which are owned in the names of other brokerage firms, according to a person familiar with the raid.

That person said that a group of Finra investigators hauled away copies of documents regarding omnibus accounts at Scottsdale that included those owned in the names of Belize-based Titan International Securities Inc. and Cayman Islands-based Caledonian Global Financial Services Inc., and a Cayman account linked to Scottsdale owner John Hurry.

Gerald Russello, a partner with the law firm of **Sidley Austin LLP** who represents Scottsdale, declined to comment. Representatives of Titan International did not return a phone call seeking comment.

Caledonian Global CEO Kobi Dorenbush said his firm had not been contacted by any U.S. regulators.

The action at Scottsdale's Arizona offices came a month after brokerage firm **Brown Brothers Harriman & Co.** was fined a record $8 million by Finra in a settlement over alleged violations of anti-money laundering regulations. Finra also levied a $25,000 fine and a one-month suspension from the securities industry against Harold Crawford, the New York-based firm's former anti-money-laundering compliance officer.

Finra said that, from January 2009 to June 2013, Brown Brothers executed trades or delivered securities in transactions involving at least 6 billion penny stock shares, with many of those transactions made through omnibus accounts on behalf of clients that the firm could not identify. Some of the $845 million in proceeds were allegedly wired to Switzerland, Guernsey and Jersey, countries with strong bank secrecy laws. Those locations and transactions should have raised red flags with Brown Brothers and prompted the firm to file suspicious activity reports under federal anti-money-laundering regulations, according to Finra.

Brown Brothers agreed to the settlement without admitting or denying Finra's findings. The firm also issued a statement saying it had changed its procedures for handling low-priced securities and for surveillance of

activity in low-priced securities to "mitigate a possible recurrence of this matter." Brown Brothers also said that the activity covered by the settlement represented a small part of its investor services business and did not involve its investment management or private banking business.

Some violations of anti-money-laundering regulations have been closely linked with stock manipulation and pump-and-dumps of microcap stocks, both of which have been identified as priority areas for enforcement action by Finra and the Securities and Exchange Commission.

Finra's action against Brown Brothers has gotten the attention of broker-dealers, anti-money laundering consultants and lawyers for two reasons. The fine, the largest ever handed down for an anti-money-laundering violation by Finra, has served notice that the regulator is serious about firms cleaning up their anti-money-laundering programs. And the fact that Crawford was fined for the company's alleged failure to create an effective anti-money-laundering program is seen by some as unfair.

"Finra has served notice that there is personal responsibility for a company failing to implement an adequate program," said Kevin Petrasic, a partner in the Washington office of law firm Paul Hastings LLP, whose practice includes anti-money-laundering litigation.

"It is a no-win situation and a bit draconian," he said. "AML compliance officers are in a barbell on this. They want to put a program in place, and Finra expects that program to work, but sometimes the senior management doesn't want to pay for the resources, so they choose not to implement the program, and the AML officers are in the middle between management and the regulators. Who wants that job?"

In Crawford's case, he went to Brown Brothers' management and proposed changes that would affect the anti-money-laundering program, according to documents that Finra staff filed in their administrative action. In November 2011, Crawford and other Brown Brothers compliance staff are said to have recommended that the firm stop executing trades for penny stocks below a certain threshold value. They are also said to have recommended that the firm require omnibus account clients that wished to offer brokerage services to their own customers to set up a disclosed subaccounts.

Brown Brothers did not change how it handled penny stocks until last June, according to Finra.

Omnibus accounts are often held in the name of foreign financial intermediaries who, in turn, are handling stocks for clients that might not be known to the U.S. broker-dealer. Finra has told broker-dealers that it is important to know who are the actual investors behind the omnibus accounts.

Anti-money laundering regulations are designed to keep money made in illegal activities from being made to look as if it is the product of legitimate endeavors. With Finra, they center on Rule 3310. It requires each brokerage firm to implement a compliance plan that is approved by a member of senior management in writing. The plan must be designed to detect and assure the reporting of suspicious transactions. The plan must also comply with the Bank Secrecy Act and include an annual independent compliance test. Firms are also required to identify to Finra an individual or group responsible for the day-to-day operation of the anti-money-laundering program.

Each year in January, Finra issues its Regulatory and Examination Priorities Letter which details issues where the regulator plans to devote resources. In 2012, the letter named microcap stock fraud as an enforcement priority.

"As a part of their anti-money laundering responsibilities, member firms are obligated to monitor suspicious activity and to file Suspicious Activity Reports where warranted," the 2012 letter stated.

Last year, efforts against money laundering received their own paragraph in the letter.

"Finra examiners continue to focus on AML compliance, particularly at firms with higher-risk business models due to their clients, products and service mix or location in which they operate."

This year, Finra doubled the space in its letter devoted to efforts against money laundering. The regulator said it planned to focus on institutional business, as well as a trend of broker-dealers not pursing the identities of some shareholders in transactions disposing of large volumes of low-priced stocks.

"I think what is going on is obvious," said a former Finra official who now consults on anti-money-laundering issues. "Finra feels like these regulations have been on the books for what, 11, 12 years? The firms have had a chance to put AML programs in place, hire good people, and still there are problems. So Finra jumps the fines to get their attention. They are saying, 'We are serious and unless you take care of this, it is going to cost you some real money.'"

Paul Tyrrell, of counsel in the Boston office of law firm Sidley Austin LLP, said that some in the brokerage industry have been rattled by Finra's targeting of individuals for enforcement of anti-money-laundering rules.

"Where is the line being drawn?" he said. "I don't know and nobody else does either. What we are seeing in the [anti-money-laundering] exams is that Finra is being more robust, running it down to the end. They are asking what you did, and when you did it, and people are worried that Finra is now looking at AML officers, branch managers and even individual representatives."

For example, in March 2013, the regulator accused James Pilla, a registered representatives of Ameriprise Financial Services Inc., of failing to report red flags raised by penny stock trades in 26 of his client accounts and failing to meet face-to-face with 59 of his clients to verify their identities before opening their accounts. His actions allegedly violated Ameriprise's anti-money-laundering procedures. Finra suspended him for three months and fined him $15,000.

Finra filed 36 anti-money-laundering actions last year, down from 45 in 2012 and 38 in 2011. The regulator did not make anyone available to comment for this story.

Among its actions was a $1.4 million fine against **Oppenheimer Holdings Inc.** last August for alleged violations that included a failure to conduct due diligence on foreign financial intermediaries. Finra claims that from August 2008 through September 2010, Oppenheimer sold 1 billion unregistered penny stock shares on behalf of 13 clients, without performing due diligence on the status of the shares. The firm also allegedly failed to probe suspicious trading by a Bahamas-based broker-dealer. Oppenheimer agreed to pay the fine without admitting or denying Finra's allegations.

In December, Finra fined COR Clearing LLC of Omaha, Neb., $1 million over allegations that, for three years beginning in 2009, the firm failed to establish and implement anti-money-laundering policies and for a time in 2012, its anti-money-laundering program had almost collapsed. COR accepted the penalty without admitting or denying the allegations.

Both COR and Oppenheimer were required to hire independent consultants to monitor and evaluate their anti-money-laundering programs.

World Trade Financial Corp., a San Diego-based brokerage firm, was the subject of a $250,000 fine after Finra alleged it violated anti-money-laundering regulations by not setting up and enforcing supervisory procedures. From March 2009 to August 2011, World Trade bought and sold 27.5 billion shares of a dozen different penny stocks on behalf of one client. Those shares were unregistered and not eligible for an exemption from registration requirements, according to Finra. The transactions generated $61 million in proceeds for the client. The business generated by those transactions was the lion's share of World Trade's business.

The firm accepted the fine without admitting or denying the allegations.

The link between anti-money-laundering regulations involving omnibus accounts and penny stock trading is a growing topic of conversation in the brokerage industry.

"It is what everybody is talking about, and the recent Brown Brothers bust has really made it obvious that's what Finra is worried about as well," said one brokerage firm executive.

The connection was brought into sharp focus by the SEC's recent lawsuit and emergency asset freeze order against John Babikian, a Canadian national who the commission claims is behind the now defunct stock promoter Awesome Penny Stocks.

At the SEC's request, the federal court in Manhattan froze assets belonging to Babikian including two homes in Los Angeles, farm and vineyard land in Oregon and a fractional interest in a corporate jet.

In its lawsuit filed last month, the SEC alleged that Babikian sold 1.3 million shares of coal mining company **America West Resources Inc.** on Feb. 23, 2012, in 90 minutes, after first promoting the stock to 700,000 subscribers to Awesome Penny Stocks' e-mail newsletters. He allegedly made $1.9 million, selling the shares through an omnibus account with Swiss bank Frankfurter Bankgesellschaft (Schweiz) AG maintained by Brown Brothers.

In a set of Finra internal records from 2012 and 2013 obtained by The Deal, the regulator said it has initiated probes of suspicious trading activity involving offshore entities tied to pump and dumps in **Toron Inc.**, U.S. Highland Inc., Bioflamex Corp., **Goff Corp.** and **Marine Drive Mobile Corp.** Those reports were furnished to the SEC.

The offshore brokerage firms cited by Finra in those reports include Caledonian Global, Caledonian Bank Ltd., Caledonian Securities Ltd., Clearwater Securities Inc., Legacy Global Markets SA, Argus Stockbrokers Ltd., CBH Compagnie Bancaire Helvetique SA, Bank Gutenberg AG, Sherman Capital, Rigi Capital and Verdmont Capital SA.

The regulator obtained trading records regarding the omnibus accounts from Scottsdale Capital, Brown Brothers, **Vertical Group**, Knight Execution and Clearing Services LLC, OC Securities Inc. and Ascendiant Capital Markets LLC, according to the Finra records.

Scottsdale is already the subject of investigations by Finra, the SEC and the FBI pertaining to an unusual $34 million pump and dump involving a German company known as Biozoom Inc., according to a person familiar with the situation. Scottsdale's clearing agency and related entity, Salt Lake City-based Alpine Securities is also a part of those probes.

The firms have provided securities officials with documents pertaining to the Biozoom trades and shareholders, including those sought under a request from the SEC and Finra that employees turn over all personal notes regarding Biozoom. Scottsdale and Alpine were also forbidden from destroying any Biozoom records.

The SEC filed a lawsuit last July, claiming that a group of 10 Argentine nationals had opened brokerage accounts at Scottsdale and New York-based Legend Securities Inc., depositing shares and providing paperwork stating that the Biozoom stock was purchased from shareholders in Entertainment Art Inc., the registered shell company that had merged with Biozoom to bring it public in February 2013.

Biozoom, which lists Kassel, Germany, as its headquarters, claims to produce a "biofeedback device" that consumers can use to monitor and analyze data related to their health.

The SEC alleges that the stock purchase agreement documents were false and that the Entertainment Art investors had sold all of their stock in 2009.

The account documents furnished by the Biozoom shareholders led to speculation that members of the group were not the real investors, but instead were simply nominees. None of the Argentines listed investor as their profession, and none of them deposited or traded in any other stocks, according to a person familiar with the investigation. The Argentine group is said to have included retired teachers and the owner of a delicatessen.

Scottsdale Advisors is said to have given the Biozoom shareholders perks that were not available to other clients. They submitted trade orders by e-mail or instant messaging, which the firm did not allow for most clients. The Biozoom shareholders were also charged commissions of just 2%, while other clients paid 4% to 4.5%.

The Biozoom shareholders were also allowed to wire funds from their accounts to banks in Cyprus, Switzerland, Panama and Belize, despite a standing anti-money-laundering policy at Scottsdale that usually only allows clients to wire funds to U.S. banks or to institutions in the country where they live.

The SEC halted trading in Biozoom on June 25 and, in July, asked the court for an emergency order freezing the defendants' assets. That kept $16 million in stock sale proceeds in the U.S. Another $17 million had already been wired overseas prior to the freeze.

The SEC alleges says that, from March 2013 through June, the Argentines received 20 million shares of Biozoom, which was about one-third of the company's stock. In May, they sold 14 million shares reaping almost $34 million.

The shares were sold into a promotion that started May 16, as the company issued a series of press releases, and continued into June. Biozoom's share price tripled, reaching an intraday high of $4.50, implying a valuation of $421.5 million.

As of June 30, Biozoom owned assets valued at only $1.05 million, according to its last filing with the SEC. In the quarter ending June 30, the company had no revenue and a loss of $328,671.

When the stock was halted, the shares were at $3.45. When trading resumed, they plunged to 13 cents, cutting more than $300 million from Biozoom's market value.

Share    Reprint    Save to My Articles

Privacy | Terms and Conditions | My Account | Contact Us

@Copyright 2013, The Deal, LLC. All rights reserved. Please send all technical questions, comments or concerns to the Webmaster.