**EXHIBIT F**



Sign Up For Emails | Log in

Help / Contact Us: 1-888-667-3325 / customerservice@thedeal.com

Search articles with key words or company names

## LAW

# Scottsdale Capital, its principal John Hurry are subject of Finra action over offshore trading

*The case is one of the latest that regulators and law enforcement have pursued to crack down on the use of offshore entities to trade in microcap stocks.*

By Bill Meagher    Updated on May 28, 2015, 05:09 PM ET

The staff of the Financial Industry Regulatory Authority has filed a complaint alleging Scottsdale Capital Advisors and its director John Hurry set up an offshore entity in the Cayman Islands, recruited clients and allowed them to trade penny stocks in violation of Finra regulations, using two other U.S. brokerage firms that Hurry controls.

The complaint also names Scottsdale Capital chief compliance officer Timothy DiBlasi and in-house counsel Michael Cruz.

The case is one of the latest actions that regulators and law enforcement have taken to crack down on offshore trading in U.S.-registered penny stocks to avoid compliance with American disclosure and anti-money-laundering rules. The dispute between Finra and Scottsdale also raises issues about regulation of the U.S. microcap market which some say makes it harder than necessary for smaller companies to raise capital.

Hurry and Finra have had a contentious relationship in the past. Hurry, his wife Justine and businesses controlled by the couple brought a $50 million lawsuit against the brokerage industry regulatory organization in November. The suit accuses Finra of "deliberate, retaliatory and malicious conduct" in bringing investigations against Hurry and the microcap-focused Scottsdale Capital. Hurry claims, in documents filed in U.S. District Court in Phoenix, that Finra is retaliating for Hurry's creation the Association of Securities Dealers LLC, an organization that he hopes will compete with Finra as a self-regulatory organization for the securities industry.

The lawsuit also alleges that Finra orchestrated a campaign of harassment through defamatory statements, press leaks, interference with Hurry's business relationships and by teaming up with the **Securities and Exchange Commission** to pursue actions against Scottsdale and Alpine Securities Corp., another brokerage firm that Hurry controls.

He filed another lawsuit against Finra in 2013 accusing the association of trespassing, but the action was withdrawn after Finra threatened to expel Hurry and others from the securities business, according to his November lawsuit.

The SEC hasn't brought an action against Hurry, Scottsdale or Alpine.

Finra initially asked the court to dismiss the Hurrys action because they had not exhausted administrative remedies, but the court has ordered Finra to file a brief demonstrating the remedies available to the couple. That order is pending.

Aside from the May 15 complaint filed by Finra's enforcement department with the association's Office of Hearing Officers, Finra has at least two other investigations looking into the Scottsdale Capital, according a document submitted by Finra in answer to Hurry's lawsuit.

Finra's May 15 complaint alleges that Hurry created and controls a Cayman-based broker-dealer called Cayman Securities Clearing and Trading Ltd. "to make it an attractive intermediary for individuals engaged in the high-risk microcap stock liquidation business through foreign financial institutions."

Because Cayman Securities is located offshore, its clients can take advantage of Cayman's financial privacy laws, and since Hurry controls Scottsdale as well as Salt Lake City-based Alpine Securities, Finra alleges that "Hurry was able to have their [Cayman clients'] suspect microcap liquidations facilitated by his trio of broker-dealers, without the scrutiny that the transactions demanded."

Finra charges that Cayman Securities set up accounts and subaccounts with Scottsdale and that Cayman clients deposited 650 million shares of microcap stocks, and sold off almost 145 million shares, making $5.5 million.

The complaint alleges that between Dec. 1, 2013 and June 30, 2014, Cayman processed sales of 74 million unregistered shares on behalf of four offshore broker-dealers, generating $1.7 million in profits for their clients trading in just three microcap stocks.

The complaint also states that while Hurry recruited all of Cayman's clients, he intentionally delegated supervisory responsibilities for the Cayman-based brokerage to an individual identified only as G.R., who had no prior securities experience so that the penny stock transactions would not be questioned.

Finra states that the transactions run through Cayman followed a pattern where a third party loaned the securities-issuing company funds in exchange for convertible notes. The notes would be exchanged by a foreign customer of Cayman Securities for unregistered shares that would be deposited with Scottsdale. Shortly after that, the shares would be liquidated and the proceeds wired out.

The lawsuit claims that 60 million shares of Neuro-Hitech Inc. (NHPI), a New York-based biopharmaceutical company, were deposited with Cayman Securities and sold through Scottsdale. Investors deposited 7.8 million share of Voip Pal.com Inc. (VPLM), a Bellevue, Wash., developer of voice-over-Internet protocol applications, with Cayman, again selling them off through Scottsdale. Finally, investors ran 6.4 million shares of **Orofino Gold Corp.**, now called **Bakken Energy Corp.** (BKEN), through Cayman with Scottsdale liquidating the stock.

Finra alleges that since the 74.2 million shares were not registered and did not qualify for an exception to registration requirements, Scottsdale and Hurry violated Finra Rule 2010. Because he allegedly failed to set up an adequate supervisory system to assure the microcap stocks traded were registered and in compliance, DiBlasi allegedly violated **NASD** Rule 3010(a)(b) and Finra Rule 2010. Cruz, according to the complaint, failed to adequately follow up on "red flags" raised by the microcap transactions, allegedly

violating NASD 3010(b).

Finra is asking that Scottsdale and Hurry be forced to disgorge the $170,000 the Scottsdale, Ariz.-based firm collected in commissions on the microcap transactions and that Scottsdale bear the cost of the proceedings.

Michelle Ong, a Finra spokesperson, declined to comment because the matter was being litigated.

Scottsdale's counsel Kevin Harnisch, a partner in the Washington office of Steptoe & Johnson LLP, said in an e-mail that "Scottsdale Capital is a market leader with respect to microcap securities trading in the over-the-counter market. FINRA has embarked on a broad and misguided mission to try to shut down the OTC market and thereby deprive many small companies of much needed access to capital. FINRA's efforts contradict legislative efforts, such as the JOBS Act, to promote entrepreneurship and small business growth. FINRA's complaint is wrong on both the facts and the law. Scottsdale Capital and its principals complied at all times with their obligations under the securities laws, as the evidence will show at a hearing."

Finra's complaint against Scottsdale shows regulators' and law enforcement's continuing interest in offshore firms involved in the U.S. microcap market.

In February, the SEC filed a lawsuit against **Caledonian Bank Ltd.**, Caledonian Securities Inc., Clearwater Securities Inc., Legacy Global Markets SA and Verdmont Capital SA, charging that the offshore brokerages had sold unregistered shares of penny stocks and reaped more than $75 million in profits. The Caledonian firms are based in the Cayman Islands, Clearwater is in Belize, and Legacy and Verdmont are in Panama.

Last September, the Justice Department indicted Titan International Securities Inc., Legacy Global, Unicorn International Securities and a group of individuals associated with the firms on charges of hiding the identities of investors, tax evasion, money laundering, and securities fraud. Titan and Unicorn were both based in Belize before the firms were suspended by Belize authorities. The SEC filed parallel civil charges. Both the criminal and civil cases continue.

Finra's May 15 complaint against Scottsdale alleges that four different offshore broker-dealers opened accounts and sub-accounts with Cayman Securities to trade penny stocks. The broker-dealers are only identified in Finra's complaint by the country were they are based and by initials. The complaint alleges that the Belize entities are TIS, UIS and DS. It also identifies a Panama-based firm with the initials MS.

Finra officials made an unannounced visit to Scottsdale's offices in March 2014 and gathered records pertaining to accounts and trades made by Titan, according to a person familiar with the situation.

Finra and the SEC have also has gathered records regarding trades made through Scottsdale and Alpine in shares of Biozoom Inc., a Kassel, Germany-based company that purported to manufacture a "biofeedback device" that consumers could use to monitor their health. The company went public in a reverse merger in February 2013, raising $1.1 million in a private placement at the time.

The SEC suspended trading in Biozoom in June 2013 after a stock promotion. In July, regulators froze almost $16 million in proceeds from sales of Biozoom shares in accounts at Scottsdale, Alpine and Legacy Securities in New York, after $17 million had already been wired out of the country.

The SEC brought a lawsuit against 10 Argentinians who sold large blocks of Biozoom. In December 2014, the U.S. District Court in Manhattan ordered two of the investors to relinquish 4.45 million Biozoom shares and in January 2015, the court entered default judgments against the rest of the Argentine shareholders.

Six of those shareholders had accounts with Scottsdale, according to SEC filings. All of those shareholders were from Buenos Aires and opened their accounts in the same week. The account applications had similar handwriting, the answers on foreign due diligence packages were similar and the shareholders all had bank accounts in Cyprus, Panama and Switzerland, according to the SEC. They also had similar e-mail accounts that had all been opened within the same week.

Scottsdale provided those investors with services that were not available to other Scottsdale clients, a source told The Deal. Typical clients paid 4% per transaction or 4.5% if their transactions were cleared through Alpine. Longtime clients who did a heavy volume of business might occasionally have received a discount of one percentage point. But Biozoom clients paid just 2%.

They were also allowed to place orders using instant messaging, which generally was forbidden under Scottsdale's internal policies, but the policy was changed for the Biozoom shareholders by the brokerage firm's management after Biozoom shareholders complained.

A standing Scottsdale policy only allowed clients to wire funds from their accounts to banks in the U.S. or to institutions in the country where they lived. But the person said that Biozoom shareholders were allowed to send funds to Cyprus, Switzerland, Panama and Belize, despite the fact that all of them lived in **Argentina** and all had signed documents agreeing to abide by Scottsdale's wire policy. Some of those funds comprised the $17 million that were wired overseas before the assets were frozen at the SEC's request.



**The Deal**
1-888-667-3325
+1-212-313-9251 (International)
customerservice@thedeal.com

**BoardEx**
1-888-257-6082
+44 (0) 20 7160 9600
sales@boardex.com

**Follow Us**

@TheDealNewsroom

The Deal

The Deal

Join one of our LinkedIn groups:
The Corporate Dealmaker Connection
The Private Equity Connection
BoardEx

**Services**

The Deal
BoardEx
PrivateRaise
Activist Service
Out-of-Court Restructuring
Event Driven Service
Connections
Advertise with us
Reprints & Permissions

**About Us**

Company Overview
Leadership
Services
Press Room
Industry Awards

© The Deal. All Rights Reserved. We respect your privacy. View our terms & conditions.